**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SHARELLE BRIDGES and ANTHONY
BRIDGES, on behalf of their son, D.B., a
minor, and individually on their own
behalf,

        Plaintiffs,

           v.

SCRANTON SCHOOL DISTRICT,

      Defendant.

CIVIL ACTION NO. 3:CV-12-2531

(JUDGE CAPUTO)

<u>**MEMORANDUM**</u>

      Presently before the Court is Defendant the Scranton School District's (the "District")

Motion for Summary Judgment. (Doc. 31.) Plaintiffs, D.B., a minor student, and his parents,

Sharelle Bridges ("Mrs. Bridges") and Anthony Bridges ("Mr. Bridges") (collectively,

"Plaintiffs"), contend that D.B. was harassed and bullied by other students while he was in

first grade and by his teacher while he was in second grade.  Plaintiffs assert claims against

the District for deprivation of their substantive due process rights under the Fourteenth

Amendment  and violations of Title VI of the Civil Rights Act of 1964.  Because the facts

when viewed in the light most favorable to Plaintiffs fail to establish a substantive due

process or Title VI claim, the District's motion for summary judgment will be granted.

### I. Background

      D.B. attended first and second grade at two elementary schools within the Scranton

School District.  D.B. attended Francis Willard Elementary School for first grade, while he

attended Robert Morris Elementary School for second grade. (Doc. 33, *Defendant's

Statement of Facts*, "*Def.'s SMF*," ¶ 1; Doc. 50, *Plaintiffs' Counterstatement of Facts*, "*Plfs.'

CSF*," ¶ 1.) D.B. attended Robert Morris for second grade following a move to a new home.

(*Def.'s SMF*, ¶ 27; *Plfs.' CSF*, ¶ 27.)  Following his second grade year, D.B.'s parents

enrolled him in Connections Academy, a cyber school in the Scranton School District. (*Def.'s SMF*, ¶ 68; *Plfs.' CSF*, ¶ 68.)  D.B. intends to stay at Connections Academy until he leaves for college. (*Def.'s SMF*, ¶ 22; *Plfs.' CSF*, ¶ 22.)  D.B. and his parents are African-American. (*Compl.*, ¶¶ 4-5; *Def.'s Answer*, ¶¶ 4-5.)

D.B. testified that he was bullied by other students on multiple occasions while he was in first grade at Francis Willard Elementary School. (*D.B. Dep.*, 30:18-32:13, 38:11-39:21.)  On one occasion, D.B.'s arm was twisted and he had to go to the hospital and get a cast. (*Id*. at 31:18-32:2.)  On another occasion, D.B. was jumped by two students and he was kicked and stomped while he was on the ground. (*Id*. at 32:32:3-13.)  D.B. also had to go to the hospital following that incident. (*Id*.)  A third incident in first grade involved D.B. being stabbed in the chest with a safety pin. (*Id*. at 38:17-21.)  Thereafter, the same student retaliated against D.B. by slamming him into a brick wall at school. (*Id*. at 39:6-9.)

These incidents were all reported to the school principal, Ms. Leitzel. (*Id*. at 39:23-40:7.)  Following these incidents, D.B.'s classroom was changed. (*Id*.)  Mrs. Bridges testified that D.B.'s classroom was changed three or four times that year, and Ms. Leitzel did that to make D.B. comfortable. (*Mrs. Bridges Dep.*, 40:9-22.)  After D.B. was moved classrooms, he might still be shouted at or hit, but he was no longer jumped. (*Id*. at 41:6-12.)  According to Mr. Bridges, there were two meetings with Ms. Leitzel about D.B. being bullying while he was in first grade. (*Mr. Bridges Dep.*, 18:8-20:13, 105:8-106:17.)   Following the first meeting, Ms. Leitzel indicated that the instances of bullying would be investigated. (*Id*. at 19:16-20:5.)  Ms. Leitzel testified that she recalled investigating incidents involving D.B. on the playground, but she never reduced her investigations to writing. (*Ms. Leitzel Dep.*, 21:8-25.)  Ms. Leitzel also testified that D.B. was friends with the boys involved in those incidents. (*Id*. at 19:3-20:14.)  Ms. Leitzel indicated that her investigations revealed that D.B. was also "hands-on with the boys," and she disagreed with characterizing D.B. as having been

2

"attacked" or "jumped." (*Id*.)

D.B. testified that he was also bullied by other students on one occasion in second grade. (*D.B. Dep.*, 27:9-29:14.)  In that case, D.B. was out on the playground, when two students approached him and then two more students came from the other direction and jumped him. (*Id*.)  D.B. fought them off by kicking one student and punching another student. (*Id*.)  The other two students ran off. (*Id*.)  Following that incident, D.B.'s teacher, Mrs. Wilcha, gave him detention, but no detention was given to the other students that started the fight. (*Id*.)  Mrs. Wilcha asked the other students what happened and their side of the story, but D.B. never got the opportunity to explain his side of the story. (*Id*.)  D.B. got detention as a result of that incident. (*Id*.)  Also while D.B. was in second grade, another student tried to jab him in the eye with a pencil during class. (*D.B. Dep.*, 41:20-42:2.)  Mrs. Wilcha, D.B. testified, did nothing in response to that incident. (*Id*.)

In addition, D.B. testified that he was bullied on a number of occasions while he was in second grade by Mrs. Wilcha.  Mrs. Wilcha, however, disputes the contention that she bullied or harassed D.B.  In his second grade class, D.B. was the only African-American student, and there was one biracial student. (*Mrs. Bridges Dep.*, 132:5-11.)

According to D.B., Mrs. Wilcha threw or flung his desk on the floor on two occasions. (*D.B. Dep.*, 18:12-19:2.)  And, on a third occasion, Mrs. Wilcha turned the desk over, shook everything out of it, and yelled at D.B. to pick his things up. (*Id*.)  Mrs. Wilcha, however, testified that she never turned over his desk. (*Mrs. Wilcha Dep.*, 60:14-18; 152:13-16.)

D.B. also testified that Mrs. Wilcha was very mean to him while he was in second grade. (*D.B. Dep.*, 18:10.)  D.B. indicated that Mrs. Wilcha would unfairly give him detention. (*Id*. at 19:3-12.)  She would also write his name on the board for no reason, such as when his name was put on the board because he brought in a snack that Mrs. Wilcha did not like. (*Id*. at 22:3-19.)  Mrs. Wilcha testified, though, that his name was never written on the board

for having an unhealthy snack. (*Mrs. Wilcha Dep.*, 47:5-14.)  Mrs. Wilcha did recall that D.B.'s name, as well as the names of other students, were placed on the chalkboard during that year pursuant to her behavior plan. (*Id*. at 56:12-20.)  And, Mrs. Wilcha remembered giving other students detention that year, and she recalled giving another student numerous detentions during that school year. (*Id*. at 154:6-11.)

D.B. further testified that he was verbally abused by Mrs. Wilcha, and she called him a "dummy," "stupid," and "lazy." (*D.B. Dep.*, 34:15-36:11.)  This happened on two occasions. (*Id*.)  On one instance, D.B. answered a question incorrectly, and Mrs. Wilcha asked if he was stupid. (*Id*.)  On the second occasion, Mrs. Wilcha was going around the class and she just referred to D.B. as stupid. (*Id*.)  Mrs. Wilcha, D.B. testified, never said that to any other students. (*Id*.)  Mrs. Wilcha denied that she ever called D.B. dumb or stupid. (*Mrs. Wilcha Dep.*, 56:7-11.)

D.B. also testified that Mrs. Wilcha made him sit by the window. (*D.B. Dep.*, 44:3-15.)  In the winter, D.B. indicated that Mrs. Wilcha would leave the window open so he could freeze, while when it was hot outside she would keep the window closed. (*Id*.)

D.B. also recalled a time during second grade when he sprained his ankle and had crutches. (*D.B. Dep.*, 24:23-26:3.)  D.B. had the crutches for about two weeks. (*Id*.)  One time, Mrs. Wilcha ordered another student to get the crutches and put them in the back of the room. (*Id*.)  Later that day when D.B. needed the crutches, nobody got them for him. Instead, he had to crawl on the floor to get his crutches. (*Id*.)  Mrs. Wilcha recalled D.B. having crutches. (*Mrs. Wilcha Dep.*, 117:10-119:3.)  According to Mrs. Wilcha, D.B.'s crutches were resting against a counter and they kept falling. (*Id*.)  Mrs. Wilcha instructed another student to put them in a corner about three or four feet from D.B.'s desk, and stated that they would get the crutches for D.B. (*Id*.)  Mrs. Wilcha stated that this was done as a safety precaution. (*Id*.)

4

Mrs. Bridges testified that D.B. was harassed in second grade by Mrs. Wilcha with respect to a food allergy.  Specifically, D.B. had a strawberry allergy and Mrs. Bridges had a concern about his exposure to strawberries during second grade. (*Mrs. Bridges Dep.*, 132:17-139:21.)  Although D.B.'s strawberry allergy was noted in his school planner and Mrs. Bridges testified that she had completed an information card identifying his allergy, students were permitted to bring strawberries to class and eat them around her son. (*Id*. at 135:4-11, 137:1-2.)  Mrs. Bridges raised this issue with Mrs. Wilcha and Ms. Damiano, the school principal, but they indicated that they were unaware of D.B.'s allergy. (*Id*. at 136:20-138:3.)  Mrs. Bridges filled out an information card again indicating D.B.'s allergy, but there continued to be issues with strawberries, as Mrs. Wilcha continued to allow students to have strawberry products. (*Id*. at 138:11-139:15.)  This, Mrs. Bridges testified, was in contrast to how Mrs. Wilcha handled another student's allergy to peanuts. (*Id*.)  One time, Mrs. Bridges sent D.B. to school with a peanut butter cup, and Mrs. Wilcha sent a letter home stating that D.B. could not bring snacks with peanut butter because a classmate had a peanut allergy. (*Id*.)  Mrs. Wilcha testified that she was unaware that D.B. had a strawberry allergy until it was brought up by Mrs. Bridges. (*Mrs. Wilcha Dep.*, 106:4-9.)  Mrs. Wilcha further testified that even though D.B.'s strawberry allergy was identified in his school planner, it was on a page towards the beginning of the planner that she had not viewed. (*Id*. at 110:5-7.)  Ms. Damiano also did not know if the allergy was marked in D.B.'s student planner because that was not something she would look at. (*Ms. Damiano Dep.*, 91:18-22.)  Ms. Damiano further testified that when the issue about the strawberry allergy first arose, there was no documentation or yellow card with the nurse indicating that D.B. had such an allergy. (*Id*. at 92:10-94:7.)

Mrs. Bridges attended three or four meetings with Mrs. Wilcha and Ms. Damiano while D.B. was in second grade. (*Mrs. Bridges Dep.*, 46:11-24.)  Mrs. Bridges attended

those meetings with her mother, and on one occasion, Mr. Bridges also was in attendance. (*Id.*)  The first meeting took place on October 3, 2011. (*Id.* at 50:7-18.)  That meeting pertained to D.B.'s behavior in class. (*Id.* at 52:5-9.)  Mrs. Bridges requested a class change for D.B., but Ms. Damiano would not change his class. (*Id.* at 56:12-57:22.)  Mrs. Bridges also testified that Mrs. Wilcha referred to D.B. as a "gabber" at that meeting and that she had to move his desk a few times because she believed he could not see the board and needed glasses. (*Id.* at 52:16-53:16.)  D.B. attended that meeting, and when he tried to explain himself, Mrs. Wilcha put her hand in his face, indicating that he be quiet. (*D.B. Dep.*, 23:5-20.)

The second meeting took place on October 12, 2011, and Mrs. Bridges attended it with her mother and husband. (*Mrs. Bridges Dep.*, 58:15-17, 59:11-13.)  The purpose of that meeting was to look at D.B.'s educational record, and they sat in the library and reviewed D.B.'s records. (*Id.* at 59:14-22.)  Mrs. Bridges also indicated that Mrs. Wilcha again referred to D.B. as very talkative, a "gabber." (*Id.* at 60:1-6.)  According to Mrs. Bridges, she did not tell Ms. Damiano at either that meeting or the October 3, 2011 meeting that Mrs. Wilcha was bullying D.B. (*Id.* at 65:19-25.)

Mrs. Bridges believes that a third meeting took place on November 20, 2011. (*Id.* at 47:9.)  Ms. Damiano, however, testified that she did not have a meeting with the Bridges in November 2011 because she did not have any notes documenting such a meeting. (*Ms. Damiano Dep.*, 65:25, 82:16-19.)  Mrs. Wilcha similarly testified that if there was a meeting in November 2011, there would be a sign-in sheet documenting that meeting. (*Mrs. Wilcha Dep.*, 87:12-14.)

The final meeting between Mrs. Bridges, Mrs. Wilcha, and Ms. Damiano took place on April 26, 2012 at Mrs. Bridges' request. (*Mrs. Bridges Dep.*, 66:23-67:1.)  At that meeting, they discussed D.B.'s academic progress, that he was talkative in class, and the

discipline reports that had been sent home. (*Id*. at 67:2-19.) Mrs. Bridges testified that she did not tell Ms. Damiano that D.B. was being bullied by Mrs. Wilcha at that meeting. (*Id*. at 76:13-16.) However, Mrs. Bridges testified that she stated in front of Ms. Damiano that Mrs. Wilcha threw D.B.'s desk on three occasions. (*Id*. at 76:20-77:16.) Mrs. Bridges further testified that Mrs. Wilcha denied throwing the desk, and that Ms. Damiano indicated that she did not believe that Mrs. Wilcha would do such a thing. (*Id*.) Ms. Damiano testified that she did not recall this issue being discussed at the April 26, 2012 meeting. (*Ms. Damiano Dep.*, 105:10-16.) Mrs. Wilcha was similarly unable to recall if the turning over of D.B.'s desk was discussed during the April 26, 2012 meeting, (*Mrs. Wilcha Dep.*, 104:11-15), and she denied ever turning over D.B.'s desk. (*Id*. at 60:11-25, 152:13-16.) Mrs. Bridges also confirmed that other than the desk throwing, she never told Mrs. Wilcha or Ms. Damiano at any meeting that she believed D.B. was being bullied. (*Mrs. Bridges Dep.*, 147:5-14.)

Lastly, Mrs. Bridgers and her mother had a meeting with Louis Paris ("Mr. Paris") on June 8, 2012. (*Mrs. Bridges Dep.*, 94:4-10.) Although Mrs. Bridges had intended to meet with the District superintendent, she instead met with Mr. Paris, the head of the elementary school. (*Id*. at 94:11-15.) At that meeting, Mrs. Bridges expressed her concerns with D.B. being bullied by Mrs. Wilcha. (*Id*. at 95:20-101:12.) Mrs. Bridges explained the incidents with the desk throwing, her concerns that D.B. was being unfairly punished, and that she called him a "dummy" and "stupid." (*Id*.) Mrs. Bridges also indicated that she did not want D.B. to finish the final two weeks of school because he was scared, but Mr. Paris stated that he had to attend school because it was a truancy issue. (*Id*.) Mr. Paris also informed Mrs. Bridges at the meeting that he could provide a boundary exception because D.B. no longer wanted to attend Robert Morris. (*Id*.) Mr. Paris further stated that he would take care of the problem and get in contact with her after the meeting. (*Id*.) Following that meeting, Mr. Paris called Mrs. Bridges, and he also sent a letter including a boundary exception form. (*Id*.

7

at 100:10-101:12.)  That was the last time Mrs. Bridges spoke to Mr. Paris, and she never attempted to call back to the school to talk to Mr. Paris or William King ("Mr. King"), the school superintendent. (*Id*. at 102:12-17.)  Mrs. Bridges further testified that, outside of mentioning the desk throwing incidents to Mrs. Wilcha and Ms. Damiano at the April 26, 2012 meeting, her conversation with Mr. Paris on June 8, 2012 was the first time she expressed concerns to anyone about bullying. (*Id*. at 147:5-18.)

According to Mrs. Bridges, while D.B. was in Mrs. Wilcha's class, he began to have nightmares, he started wetting the bed, and he was frequently blinking. (*Mrs. Bridges Dep.*, 14:12-15:14.)   A psychiatric evaluation of D.B. notes that he developed anxiety and depressive symptoms in reaction to the issues he went through during his second grade year. (Doc. 50, Ex. M.)

During the summer following D.B.'s second grade year, the Bridges decided that D.B. would attend Connections Academy. (*Mrs. Bridges Dep.*, 103:5-20.)  They made that decision because they felt it would be safer for D.B. (*Id*.)

In September 2012, Ms. Damiano and Mr. Struzzieri, the District's truancy liaison for Children and Youth Services, came to the Bridges' house. (*Mrs. Bridges Dep.*, 110:13-17.) According to Mrs. Bridges, Mr. Struzzieri asked what school D.B. was attending because he had missed twenty-three or twenty-four days of school. (*Id*. at 112:22-113:6.)  Mrs. Bridges replied that she had withdrawn D.B. the prior month and to contact the administration office. (*Id*.)  Ms. Damiano recalled visiting the Bridges' house with Mr. Struzzieri. (*Ms. Damiano Dep.*, 109:9-20.) According to Ms. Damiano, D.B. had never been withdrawn and that he continued to show up on their rolls. (*Id*. at 109:21-24.) Ms. Damiano, however, was unaware at that time that the Bridges had completed a withdrawal form. (*Id*. at 110:18-111:3.)

During D.B.'s first and second grade years, the District had a bullying policy. (Docs.

8

34; 35.) The policy was the same for the 2010-2011 and 2011-2012 school years. (*Mr. King Dep.*, 74:1-20.) Although the bullying policy focused mainly on student-on-student bullying, (*id.* at 28:4-29:10), the policy also contained language addressing employees, (*id.*), and Mrs. Wilcha and Ms. Damiano understood the policy to also apply to teacher-on-student bullying. (*Mrs. Wilcha Dep.*, 126:20-23; *Ms. Damiano Dep.*, 33:5-34:24.)

In view of the foregoing events, Plaintiffs commenced this action against the District on December 18, 2012. (*Compl.*)  In Count I of the Complaint, D.B., Mrs. Bridges, and Mr. Bridges assert a claim for the deprivation of their substantive due process rights.  Count II of the Complaint sets forth a claim for violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.*

Following the close of discovery, the District filed the instant motion for summary judgment on September 2, 2014. (Doc. 31.)  Plaintiffs filed their brief in opposition to the motion for summary judgment on September 16, 2014, (Doc. 51), and the District filed its reply brief in further support of its motion on September 30, 2014. (Doc. 53.)  The District's motion for summary judgment is fully briefed and ripe for disposition.

## II. Discussion

### A.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the

applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

## B.   Fourteenth Amendment Claim

In Count I of the Complaint, Plaintiffs assert a substantive due process claim brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured, . . ." 42 U.S.C. § 1983. "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)).

Plaintiffs' § 1983 claim is based on a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment provides, in pertinent part, that a state shall not "deprive any person of life, liberty, or property, without due process of law; . . ." U.S. Const. amend. XIV, § 1. Due process under

the Fourteenth Amendment has both "substantive and procedural components." *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011). Only the substantive component of the Due Process Clause is at issue here.

In this case, both D.B. and his parents contend that their constitutional rights were violated. With respect to D.B., Plaintiffs assert that he was deprived of his liberty interest and right to bodily integrity as a result of student-on-student bullying in first grade and teacher-on-student bullying in second grade. (*Compl.*, ¶ 56.) Specifically, Plaintiffs argue that the District had a duty to protect D.B. from bullying by other students based on the District's special relationship with its student and/or pursuant to the state-created danger theory of liability. In addition, Plaintiffs contend that D.B. was deprived of his constitutional rights when he was bullied by Mrs. Wilcha. And, Plaintiffs conclude that the District is liable for the bullying of D.B. because it failed to adequately train its employees on bullying. Mr. and Mrs. Bridges, in comparison, maintain that the District interfered with their rights to make decisions regarding the custody and care of D.B. (*Compl.*, ¶ 68.)

### 1. Deprivation of D.B.'s Substantive Due Process Rights

The Third Circuit has recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citing *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1368 (3d Cir. 1992)). D.B. contends that this liberty interest was violated as a result of bullying by other students in first grade and Mrs. Wilcha in second grade. Because D.B.'s claims of bullying against his classmates and Mrs. Wilcha implicate different issues, I will address them separately.

Regarding the conduct of D.B.'s first-grade classmates, "[g]enerally, the Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts

of private individuals." *Sanford v. Stiles*, 456 F.3d 298, 303-04 (3d Cir. 2006) (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198-200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)). The Third Circuit, however, has recognized two exceptions to this general rule. *See id.* at 304. "First, the state has a duty to protect or care for individuals when a 'special relationship' exists. Second, the state has a duty when a 'state-created danger' is involved.'" *Id.* (citation and internal footnote omitted). Plaintiffs argue that both of these exceptions are applicable in this case.

### a.    A "special relationship" did not exist between D.B. and the District.

Plaintiffs first argue that the circumstances existing between D.B. and the District gave rise to a "special relationship" in this case. According to Plaintiffs, the following circumstances evidence the existence of a "special relationship" between D.B. and the District: (1) Pennsylvania's compulsory attendance laws for children between the ages of eight and seventeen; (2) the District's *in loco parentis* authority; (3) a parent is not free to withdraw a child absent egregious conditions; (4) the State has authority over what students wear and how they must behave; (5) officials can proceed against a child in juvenile court for misbehavior; and (6) the restrictions on students' liberty is reflected in the Scranton School District Handbooks. (Doc. 51, 6.)

I need look no further than the Third Circuit's *en banc* 2013 decision in *Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013) (en banc) to conclude that no "special relationship" existed between D.B. and the District in this case.[1] In *Morrow*, two sisters and their parents brought an action against a school district and the district's assistant principal alleging that the sisters "were subjected to bullying in the form of a series of threats, assaults, and acts of racial intimidation at the hands of a fellow student and her accomplice." *Id.* at 163. The

---

[1]    Surprisingly, neither Defendant nor Plaintiffs cite *Morrow* in their summary judgment submissions.

district court dismissed the plaintiffs' complaint, holding that the school did not have a "special relationship" with the students giving rise to a constitutional duty to protect them from harm from the other students given the facts alleged in the complaint. *See id*. at 164. The appeal was initially argued before a panel, but the Third Circuit subsequently granted *en banc* review. *See id*.

The *en banc* Third Circuit affirmed the judgment of the district court and held that the allegations in the complaint failed to establish a "special relationship" between the students and the school. *See id*. The majority noted that every "Circuit Court of Appeals that has considered this issue in a precedential opinion rejected the argument that a special relationship generally exists between public schools and their students." *Id*. at 170 (citations omitted). And, while the Third Circuit did not "foreclose the possibility of a special relationship arising between a *particular* school and *particular* students under certain unique and narrow circumstances," *id*. at 171 (emphasis in original), such circumstances "must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administrators as part of the school's traditional *in loco parentis* authority or compulsory attendance laws." *Id*.

In light of *Morrow*, Pennsylvania's compulsory attendance laws or the school's traditional *in loco parentis* authority fail to establish a special relationship between D.B. and the District. Moreover, the additional circumstances cited by Plaintiffs in their brief in opposition to the District's motion for summary judgment, *i.e.*, the ability to control students' behavior and dress and the authority to proceed against students in juvenile court for misbehavior, fail to establish a special relationship between this particular student and this particular school district. In fact, the discussion on this issue in Plaintiffs' brief is a nearly word-for-word recitation of a substantial portion of the principal *dissenting* opinion in that case. *See Morrow*, 719 F.3d at 189-92 (Fuentes, J., dissenting). The dissent's discussion

14

was addressed and rejected by the *Morrow* majority. *See Morrow*, 719 F.3d at 171.  As

stated by the *Morrow* majority:

> The circumstances that our dissenting colleagues rely upon to insist that a special relationship exists under the facts alleged here are not "certain narrow" circumstances at all.  Instead, they are endemic in the relationship between public schools and their students.  The dissent would hold that a special relationship exists such that "Blackhawk undertook a limited obligation to keep the Morrows safe . . . because Blackhawk compelled school attendance, exercised extensive control over not only the student victims but also the specific threat at issue in the case- a violent bully subject to two restraining orders- and enforced school policies that prevented the Morrows from being fully able to protect themselves." Fuentes Dissent 188. However, those factors do not distinguish the circumstances here from those that arise in the general relationship between public schools and their students.
>
> . . .
>
> In arguing to the contrary, our dissenting colleagues exaggerate the extent of a school's control over its students.  Judge Fuentes insists that "[t]he State's authority over children while they are in school extends beyond their well-being and is nearly absolute." Fuentes Dissent 191 (emphasis added).  However, the mere fact that a school can require uniforms, 24 Pa. Stat. Ann. § 13-1317.3, or prescribe certain behavior while students are in school, 22 Pa.Code § 12.2, does not suggest a special relationship at all.  Rather, such commonly accepted authority over student conduct is inherent in the nature of the relationship of public schools and their pupils.

*Id*.

Pursuant to *Morrow* and based on the facts in the record, a special relationship did

not exist between D.B. and the District.  Thus, the District did not have a duty to protect D.B.

from harm from other students under the special relationship exception.

> **b.**     **The District's actions did not create or enhance a danger that deprived D.B. of his substantive due process rights.**

Plaintiffs next argue that the District had a duty to protect D.B. because they created

a situation that was dangerous to D.B.  The Third Circuit has "recognized that a state actor

may be held liable under the 'state-created danger' doctrine for creating danger to an

individual in certain circumstances." *Henry v. City of Erie*, 728 F.3d 275, 281 (3d Cir. 2013)

(citing *Morrow*, 719 F.3d at 176).  Liability may attach under this doctrine "where the state

acts to create or enhance a danger that deprives the plaintiff of his or her Fourteenth

15

Amendment right to substantive due process." *Morrow*, 719 F.3d at 177 (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996)).  To prevail on a state-created danger theory, Plaintiffs must prove four elements:

> 1) the harm ultimately caused was foreseeable and fairly direct;
>
> 2) a state actor acted with a degree of culpability that shocks the conscience;
>
> 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

Here, the District argues that Plaintiffs are unable to satisfy either the second or fourth elements of this test. (Docs. 32, 12-13; 53, 12-14.)  As to the second element, the District asserts that Plaintiffs are unable to establish conscious shocking behavior because it investigated all alleged incidents of reported harassment and there is no evidence in the record that it ignored Plaintiffs' complaints. (Doc. 53, 13.)  Regarding the fourth element, the District argues that the record is devoid of evidence "of an affirmative act which placed D.B. in danger, or made him more vulnerable to harassment or cause him harm." (Doc. 32, 13.)

Plaintiffs, however, contend that summary judgment is not warranted on the state-created danger exception. (Doc. 51, 15.)  Plaintiffs argue that the second prong of the state-created danger test is satisfied because the evidence demonstrates that "William King and Louis Paris acted in willful disregard for the safety of Plaintiff." (*Id.*)  And, as to the fourth prong, Plaintiffs state: "Defendant by establishing its policies and practices regarding school bullying but defectively failing to adequately train Principal Damiano and Leitzel therein, created a danger to D.B. that would [sic] and/or render him more vulnerable to danger than if Defendant had not acted." (*Id.*)

16

Plaintiffs are unable to satisfy the fourth element because there was no affirmative action by the District which made D.B. more vulnerable than he would have been had the District done nothing at all.  The Third Circuit has made clear that under the fourth element, liability "is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.  It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282 (internal citations and quotation omitted).  Accordingly, to establish the fourth element, Plaintiffs must identify "an affirmative action, rather than inaction or omission." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citations omitted).  And, while the Third Circuit has emphasized that "the line between action and inaction is not always easily drawn," *Morrow*, 719 F.3d at 178, it has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." *Bright*, 443 F.3d at 282.  But, the affirmative act requirement "is not intended to turn on semantics of act and omission.  Instead, the requirement serves to distinguish cases where officials might have done more from cases where officials created or increased the risk itself." *Morrow*, 719 F.3d at 179 (alterations and citation omitted).

Plaintiffs have not identified any action by the District in this case that caused D.B. to be more vulnerable than he would have been had the District not acted at all.  Rather, Plaintiffs contend that it was the District's inaction, *i.e.*, its failure to adequately train its employees, (Doc. 51, 15), that put D.B. at an additional risk of harm.  However, the Third Circuit has stressed that "failures to act cannot form the basis of a valid § 1983 [state created danger] claim." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 433 n.11 (3d Cir. 2006); *see also Bright*, 443 F.3d at 284 ("mere failure to protect an individual against private violence does not violate the Due Process Clause."); *Carlin v. Marren*, No. 12-2988, 2012 WL 4717899, at *1 (E.D. Pa. Oct. 3, 2012) ("In pleading her state-created danger claim,

Plaintiff points to the following conduct committed by Rescue Squad: failure to provide its members with sexual harassment training, failure to impose bunkroom policies, failure to maintain separate sleeping facilities for men and women, failure to implement adequate security measures, failure to train and supervise members and failure to restrict access to the Rescue Squad building.  These allegations amount to nothing more than a series of actions not taken by Defendant.  As failures to act do not render Defendant liable under the fourth element, Plaintiff fails this element and cannot proceed on a state-created danger claim."); *Nawuoh v. Venice Ashby Cmty. Ctr.*, 802 F. Supp. 2d 633, 642 (E.D. Pa. 2011) (failure to train is not an affirmative act that satisfies the fourth element); *Estate of Pendelton ex rel. Pendelton v. Davis*, No. 06-1945, 2007 WL 1300743, at *11 (M.D. Pa. May 3, 2007) (failures of supervision or training do not meet the affirmative act requirement of the state-created danger test).  Moreover, it is difficult to see how the District's claimed failure to provide adequate training on its bullying policy "created a new danger for [D.B.] or rendered [him] more vulnerable to danger than had the state not acted at all." *Morrow*, 719 F.3d at 178.  Likewise, insofar as Plaintiffs argue that the District failed to follow its bullying policy, this is not the equivalent of an affirmative act under the circumstances. *Cf. Morrow*, 719 F.3d at 178 ("we decline to hold that a school's alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here."). Therefore, because the District did not affirmatively use its authority in a way that created a danger to D.B. or that rendered D.B. more vulnerable to danger than had it not acted at all, Plaintiffs are unable to establish a substantive due process claim under a state-created danger theory.

> **c.   D.B. was not deprived of his constitutional rights by Mrs. Wilcha and the District is not liable on a failure to train theory.**

Plaintiffs also contend that D.B.'s constitutional rights were violated when he was bullied by Mrs. Wilcha while he was in second grade.  Plaintiffs argue that the District's

liability is based on its failure to properly supervise and train its teachers and principals. (Doc. 51, 10.)  Because the facts when viewed in the light most favorable to Plaintiffs fail to establish a violation of D.B.'s constitutional rights by Mrs. Wilcha, summary judgment in the District's favor will be granted on the claim that it failed to train and supervise its teachers and principals.

As stated, the Due Process Clause protects an individual's liberty interest in personal bodily integrity. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citing *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1368 (3d Cir. 1992)). Here, Plaintiffs argue that Mrs. Wilcha's "abusive verbal and non-verbal abuse of D.B." violated his liberty interest. (Doc. 51, 2.)

> To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience. . . . Deprivation violates due process only when it shocks the conscience, which encompasses only the most egregious official conduct. . . . While the meaning of the [shocks the conscience] standard varies depending upon factual context, merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision.

*Chainey v. Street*, 523 F.3d 200, 219-220 (3d Cir. 2008) (internal citations and quotations omitted).

The "shocks the conscience standard [applies] to federal claims alleging the use of excessive force by public school officials." *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001) (citations omitted).  The Third Circuit has adopted a four part test for analyzing claims against a school official involving physical abuse or corporal punishment:

> a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?

*Gottlieb*, 272 F.3d at 173.  Although Plaintiffs' submissions suggest that Mrs. Wilcha

physically abused D.B., there is no evidence in the record that Mrs. Wilcha used physical force against him.  Rather, as Plaintiffs' claim implicates non-physical harassment, such as verbal abuse and throwing/emptying D.B.'s desk, at issue is whether the evidence viewed in the light most favorable to them demonstrates a violation of D.B.'s constitutional rights.

Claims involving "[n]on-physical types of harassment, including verbal abuse, require the same 'shocks the conscience' analysis." *S.M. v. Lakeland Sch. Dist.*, 148 F. Supp. 2d 542, 547 (M.D. Pa. 2001), *aff'd,* 33 F. App'x 635 (3d Cir. 2002); *M.M. v. Tredyffrin/Easttown Sch. Dist.*, No. 06-1966, 2006 WL 2561242, at *13 (E.D. Pa. Sept. 1, 2006) (claims of "non-physical harassment and psychological abuse" must also meet the shocks the conscience standard).  However, "[t]hose courts that have considered instances of psychological or verbal abuse by government actors have typically held that such conduct alone was not severe enough to qualify as a constitutional tort actionable under § 1983." *S.M.*, 148 F. Supp. 2d at 542.  For example, in *Abeyta v. Chama Valley Independent School District*, 77 F.3d 1253, 1255 (10th Cir. 1996), the plaintiff, a sixth grade student, claimed that her teacher called her a prostitute in front of her class and continued to call her that for over a month-and-a-half.  The Tenth Circuit affirmed the district court's entry of summary judgment for the defendant, stating:

> We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of a brutal and inhuman abuse of official power literally shocking to the conscience, necessary to constitute a substantive due process violation. We can imagine a case where psychological harassment might be so severe that it would amount to torture. . . . But we are sure that the actions alleged in the instant case do not reach that level- whether they were done with indifference or with deliberate intent to cause psychological harm.  Having said this, if defendant acted as alleged, we strongly condemn his behavior. A teacher who calls a student a prostitute engages in a complete abuse of his authority.  To do so repeatedly, and turn a deaf ear as other students follow the teacher's example, is flagrant misconduct. But we must leave plaintiff to whatever relief statutory or state tort law may afford her.

*Id*. at 1257-58 (internal citation and quotation omitted).  Likewise, in *Doe v. Gooden*, 214 F.3d 952, 954-55 (8th Cir. 2000) an elementary teacher was accused of "yelling and

screaming at students, using foul language, telling students that their handwriting 'sucks,' telling students that 'if they had one eye and half a brain, you could do this,' calling students 'stupid,' and referring to students as 'bimbos,' 'fatso,' and the 'welfare bunch.'" On appeal, the Eighth Circuit concluded:

> Viewing the evidence in the light most favorable to the plaintiffs, [the teacher] clearly used inappropriate language in his elementary classroom, and while we are appalled at his demeaning and belittling references to his students, his use of patently offensive language did not violate his students' constitutional rights. Verbal abuse is normally not a constitutional violation.

*Id*. at 955 (citation omitted).  In *Costello v. Mitchell Public School District*, 266 F.3d 916, 919, 921 (8th Cir. 2001), a teacher called a student "retarded, stupid, and dumb" in front of her classmates and threw a notebook at the student hitting her in the face after she got a bad grade on an assignment.  Although the Eighth Circuit found the teacher's conduct to be "singularly unprofessional," it nevertheless concluded that "the plaintiffs have not raised a genuine issue of material fact on whether his behavior was sufficiently shocking to the conscience to state a substantive due process claim." *Id*. at 921.  And, in *S.M.*, Judge Vanaskie, who was then Chief Judge of this Court, concluded that a student's fifth grade teacher did not violate her constitutional rights when, on one occasion, he "repeatedly yelled at her during class, while pointing his finger inches from her face." *S.M.*, 148 F. Supp. 2d at 547.  In reaching that conclusion, Judge Vanaskie explained:

> Although each determination of whether state conduct shocks the conscience is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred, the established precedents, consistent with the Supreme Court's admonition against an overly generous reading of the substantive component of the due process clause, compel the conclusion that [the teacher's] conduct, although unfortunate, is not conscience shocking. [The teacher's] conduct consisted of repeatedly questioning [the student] about the math problem and reprimanding her for cursing in class.  Plaintiff has not established how [the teacher's] conduct, even if considered inappropriate, could be construed as sadistic or malicious. [The teacher] may have been overzealous in conducting his class, but his conduct could not be termed brutal.

*Id*. at 548 (internal citation and quotation omitted).  Other courts have similarly noted that verbal abuse generally does not give rise to a constitutional violation under § 1983. *See,*

21

*e.g., Wyatt v. Fletcher*, 718 F.3d 496, 504 (5th Cir. 2013) ("verbal abuse does not give rise to a constitutional violation under 42 U.S.C. § 1983, so any yelling that may have occurred is not actionable."); *Acadia Ins. Co. v. Hinds Cnty. Sch. Dist.*, No. 12-188, 2013 WL 2182799, at *5 n.4 (S.D. Miss. May 20, 2013) ("It is self-evident that a student's constitutional interest in bodily integrity does not extend to allegations of verbal abuse."); *Faccio v. Eggleston*, No. 10-783, 2011 WL 3666588, at *12 (N.D.N.Y. Aug. 22, 2011) ("verbal abuse alone is not normally a constitutional violation- even in the context of teachers belittling students."); *G.C. v. Sch. Bd. of Seminole Cnty.*, 639 F. Supp. 2d 1295, 1304 (M.D. Fla. 2009) ("the use of foul or belittling language does not amount to a violation of a plaintiff's constitutional rights.").

In this case, viewing the evidence in the record in the light most favorable to Plaintiffs, Mrs. Wilcha did not engage in conscience-shocking behavior sufficient to support a substantive due process claim.  Here, the evidence demonstrates that Mrs. Wilcha called D.B. "stupid" and a "dummy" on a few occasions, that she was mean to him, and that she threw or turned over his desk three times.  While such conduct is certainly unprofessional and inappropriate, in light of the authority detailed above, Mrs. Wilcha's behavior was not sadistic or malicious.  Thus, Mrs. Wilcha's actions towards D.B. did not violate his substantive due process rights.

Nevertheless, even though Mrs. Wilcha did not deprive D.B. of his constitutional rights, Third Circuit precedent establishes that the liability of a municipality under § 1983 for a substantive due process violation does not depend on the liability of an individual official. *See Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996).  Restated, "the fact that a teacher's conduct does not shock the conscience does not necessarily relieve the school district of liability." *S.M.*, 148 F. Supp. 2d at 550.  In this case, Plaintiffs contend that the District is liable based on its failure to train and supervise its teachers and principals.

Here, the claim against the District "fails as a matter of law because plaintiff has not established that [D.B.] suffered the violation of a constitutional right.  As previously discussed, [D.B.'s] allegations relate[ ] only to what [can be] characterize[d] as verbal and psychological abuse; there is no evidence in the record as to any physical force used against [D.B.]." *S.M.*, 148 F. Supp. 2d at 551.  And, as stated in *S.M.*, "no court has held that the concept of liberty extends to freedom from verbal abuse or harassment." *Id*. Accordingly, Mrs. Wilcha's conduct of belittling D.B., throwing a desk, making him sit by an open window when it was cold outside, and being mean to him did not violate his constitutional rights. *See, e.g., id*. at 552; *see also Doe*, 214 F.3d at 955 ("while we are appalled at [the teacher's] demeaning and belittling references to his students, his use of patently offensive language did not violate his students' constitutional rights.").  Thus, because D.B. was not deprived of an interest protected by the Fourteenth Amendment, Plaintiffs cannot recover from the District under § 1983 for its failure to train its teachers or principals. *See S.M.*, 148 F. Supp. 2d at 552; *accord Crawford v. Lappin*, 446 F. App'x 413, 416 (3d Cir. 2011) ("the absence of an underlying constitutional violation precludes any supervisory liability on a 'knowledge or acquiescence' or 'failure to train' theory"); *Kneipp*, 95 F.3d at 1212 n.26 (absent underlying constitutional violation, failure to train claim against a municipality cannot stand).

In granting summary judgment in favor of the District on D.B.'s due process claims, I do not condone Mrs. Wilcha's conduct towards an elementary school student. Nevertheless, "'the Constitution does not provide judicial remedies for every social ill,'" *Morrow*, 719 F.3d at 176 (quoting *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972)), and "'the due process clause is not a surrogate for local tort law or state statutory and administrative remedies.'" *id*. (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 74 (1st Cir. 1999)).  Thus, while D.B.'s claims involving harassment and bullying by a

teacher are troubling, the conduct at issue does not support a substantive due process violation.  Rather, D.B.'s claims of abuse are appropriately addressed through common law tort claims.  *See, e.g., M.M.*, 2006 WL 2561242, at *13; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 854 n.14 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) ("To say that due process is not offended by [Mrs. Wilcha's] conduct described here is not, of course, to imply anything about its appropriate treatment under state law."); *cf. Morrow*, 719 F.3d at 176-77 (noting that Pennsylvania courts have held that school districts are "the beneficiaries of immunity pursuant to the Political Subdivision Tort Claim Act," but recognizing that state legislatures retain the authority to reconsider and change such restrictions).

### 2. Deprivation of Mr. and Mrs. Bridges' Substantive Due Process Rights

Mr. and Mrs. Bridges also allege in the Complaint that the District violated their rights related to the care, custody, and control of D.B. (*Compl.*, ¶ 68.)

"'[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011) (en banc) (quoting *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)).  "In the context of parental liberty interests, . . . the Due Process Clause only protects against deliberate violations of a parent's fundamental rights- that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." *McCurdy v. Dodd*, 352 F.3d 820, 827-28 (3d Cir. 2003) (citing *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986)).  "A conflict with the parents' liberty interest will not be lightly found, and indeed, only occurs when there is some 'manipulative, coercive, or restraining conduct by the State." *J.S.*, 650 F.3d at 933-34 (quoting *Anspach v. City of Phila*, 503 F.3d 256, 266 (3d Cir. 2007)).  "In other words, the parents' liberty interest will only be implicated if the state's action 'deprived them of their right to make

24

decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions.'" *Id*. at 934 (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005)).

The District's motion for summary judgment on the parents' substantive due process claim will be granted.  For one, Plaintiffs did not provide any response to the District's argument that the record is devoid of evidence supporting Mr. and Mrs. Bridges' substantive due process claim.  As this Court recently noted, "[c]ourts within the Third Circuit have routinely held that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended." *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, No. 12-2454, 2014 WL 4411591, at *9 (M.D. Pa. Sept. 8, 2014) (citations omitted).  Furthermore, there is no evidence of state action directed at interfering with protected aspects of the parent-child relationship or that the District deprived the Bridges of their right to make decisions concerning D.B.  Summary judgment will be granted in favor of the District on the parents' due process claim.

## C.    Title VI Claim

Plaintiffs also seek relief pursuant to Title VI of the Civil Rights Act of 1964 for harassment and a racially hostile environment.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  Public educational institutions receiving federal funds are subject to this directive. 34 C.F.R. § 100.13.[2]

---

[2]    In *Manning v. Temple University*, 157 F. App'x 509, 513 (3d Cir. 2005), the Third Circuit noted that racial discrimination claims under Title VI are considered under the *McDonnell Douglas* framework.  The court noted, however, that it had "not adapted the *McDonnell Douglas* prima facie test to the education discrimination

Title VI prohibits intentional violations of the statute, and "a plaintiff may sue a school for money damages for its failure to address a racially hostile environment." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) (citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 n.5 (3d Cir. 2001) (suggesting that Title VI hostile environment claims may lie)). "In the educational setting, a school district is liable for intentional discrimination when it has been 'deliberately indifferent' to teacher or peer harassment." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) (citing, *inter alia*, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)). Restated, "a plaintiff may recover for alleged 'severe, pervasive, and objectively offensive' student-on-student harassment if the school 'acts with deliberate indifference to known acts of harassment.'" *Whitfield*, 412 F. App'x at 521 (quoting *Davis*, 526 U.S. at 633, 119 S. Ct. 1661). This requires that the school has "actual knowledge" of the harassment. *Davis*, 526 U.S. at 650, 119 S. Ct. 1661. A school is liable for a claim of teacher or peer harassment only when its actions are "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S. Ct. 1661; *Zeno*, 702 F.3d at 666; *Whitfield*, 412 F. App'x at 521. "A district court may conclude on a motion for summary judgment that a 'response is not clearly unreasonable as a matter of law.'" *Whitfield*, 412 F. App'x at 521 (quoting *Davis*, 526 U.S. at 649, 119 S. Ct. 1661).

First, with respect to the peer harassment of D.B. while he was in first grade, Plaintiffs fail to establish a hostile environment claim. "Whether [race]-oriented conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to, the ages of the

context," and it declined to do so in *Manning* because "under any rendering of the test, [the plaintiff] fail[ed] to raise the required inference of discrimination . . . ." *Id*.

harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651, 119 S. Ct. 1661 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)).  "Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in [race].  Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title [VI] is designed to protect." *Id*. at 652, 119 S. Ct. 1661.  Here, Plaintiffs fail to establish that the difficulty D.B. experienced in first grade was racially motivated.  Indeed, Plaintiffs have not cited any evidence that D.B.'s experience in first grade implicated his race, let alone evidence that those incidents rose "to the level of severe and pervasive harassment having a systemic effect on an African-American student's access to education at [the Scranton School District]." *Whitfield*, 412 F. App'x at 522.

Moreover, even if Plaintiffs established actionable harassment while D.B. was in first grade, they fail to demonstrate that the District acted with deliberate indifference.  "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648, 119 S .Ct. 1661.  School administrators act with deliberate indifference "only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id*.  The evidence in the record confirms that the incidents in first grade involving D.B. were reported to the school principal, Ms. Leitzel. (*D.B. Dep.*, 39:23-40:7.)  Following these incidents, D.B.'s classroom was changed three or four times that year, and Ms. Leitzel did that to make D.B. comfortable. (*Mrs. Bridges Dep.*, 40:9-22.)  And, while D.B. may still have been shouted at or hit, the bullying issues were largely resolved at that point. (*Id*. at 41:6-12.)  In light of this evidence, it is apparent that Ms. Leitzel responded to the incidents of harassment involving D.B. in first

grade. Thus, the record does not support a basis to find that the District's response to the bullying of D.B. in first grade was clearly unreasonable in light of the known circumstances. The District is therefore entitled to summary judgment on Plaintiffs' hostile environment claim involving peer harassment of D.B. while he was in first grade.

Second, Mrs. Wilcha's conduct towards D.B. fails to establish an actionable hostile environment claim under Title VI.  As indicated, a racially hostile environment requires Plaintiffs to show "(1) that racial harassment was so severe, pervasive, and objectively offensive that it deprived [D.B.] of access to educational opportunity and (2) that the school acted with deliberate indifference to the harassment." *Elliott v. Del. State Univ.*, 879 F. Supp. 2d 438, 446 (D. Del. 2012) (citing *Davis*, 526 U.S. at 648-52, 119 S. Ct. 1661). Accordingly, Plaintiffs must demonstrate that the harassment of D.B. was based on race. *Accord Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) ("Title VI protects students from discrimination only if it is based on race, color, or national origin . . . ."); *Karlen v. Landon*, 503 F. App'x 44, 46 (2d Cir. 2012) (to succeed on Title VI claim, a plaintiff must prove, among other elements, that "the child in question was in fact harassed . . . based on race"); Stewart v. Moody, No. 12-338, 2012 WL 3184465 at *1 (W.D. Wis. June 19, 2012) ("Harassment by an instructor at a public institution could violate federal law under some circumstances, if the harassment was sufficiently severe or pervasive and it was motivated by a protected characteristic such as race or sex.")

Plaintiffs fail to establish a Title VI hostile environment claim based on Mrs. Wilcha's conduct while D.B. was in second grade.  Initially, Plaintiffs fail to identify evidence in the record that D.B.'s experiences in Mrs. Wilcha's class were racially motived or which permit an inference of discrimination.  Plaintiffs contend that Mrs. Wilcha's treatment of D.B. was based on race because he was the only African-American student in the class, he received detention more than other students, she yelled at him and was mean to him, and his

strawberry allergy was treated differently than another student's peanut allergy.   But, besides identifying D.B. as the only African-American student in Mrs. Wilcha's classroom, Plaintiffs do not point to any evidence in the record indicating that D.B.'s experiences in second grade were racially motivated or related to race.

Moreover, even if this conduct was based on D.B.'s race or permits an inference of discrimination, Plaintiffs have not shown evidence that it was severe, pervasive, and objectively offensive so as to deprive D.B. of access to educational opportunities.   As stated, the harassment D.B. was subject to in second grade included Mrs. Wilcha being mean to him, throwing his desk on three occasions, giving him detention, and making him sit by an open window when it was cold or a closed window when it was hot.   These incidents, however, stand in contrast to the behavior courts have found to be sufficiently indicative of persistent and pervasive racial harassment. *See, e.g., Zeno*, 702 F.3d at 666-67 (evidence of harassment over three-year period included references to lynching, physical attacks, and verbal abuse, such as being called "a 'nigger' nearly every day."); *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.928, 932-34 (10th Cir. 2003) (allegations of racial harassment included "racial slurs, graffiti inscribed in school furniture, and notes placed in students' lockers and notebooks[, and] where Caucasian males were allowed to wear T-shirts adorned with the confederate flag, swastikas, KKK symbols, and hangman nooses on their person and their vehicles."); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) (sufficient allegations of actionable harassment where African-American students "attended a school where they were called 'niggers' by white children, and where that term was written on the walls of the buildings in which they were supposed to learn civics and social studies."); *Fennell v. Marion Ind. Sch. Dist.*, 963 F. Supp. 2d 623, 644-46 (W.D. Tex. 2013) (use of racial slurs over a number of years and three incidents involving animation of a noose or an actual noose were severe and pervasive).

In addition, even if Mrs. Wilcha's treatment of D.B. was racially motivated and deemed severe and pervasive, the hostile environment claim with respect to that conduct would fail because the District's conduct was not clearly unreasonable in light of the known circumstances.   Under Title VI, "a school district must know of the harassment. Constructive knowledge is not enough; only actual knowledge is a predicate to liability." *Zeno*, 702 F.3d at 666.  Here, other than informing Ms. Damiano of the desk throwing by Mrs. Wilcha at the April 26, 2012 meeting, Plaintiffs never informed anyone that D.B. was being harassed by Mrs. Wilcha until the meeting with Mr. Paris on June 8, 2012.[3]  Following that meeting, Mr. Paris offered and provided a boundary exception to the Bridges to allow D.B. to attend a different school in the District.  And, although Mr. Paris would not excuse D.B. from the last few days of school that year, his conduct was not deliberately indifferent or clearly unreasonable.  D.B. would have completed the second grade within two weeks and he would no longer have been a student in Mrs. Wilcha's class.  Additionally, Mr. Paris offered to allow D.B. to attend another school in the District the following year.  Accordingly, Plaintiffs are unable to establish a hostile environment claim based on D.B.'s experience while a student in Mrs. Wilcha's classroom in second grade, and the District is entitled to summary judgment on Plaintiffs' Title VI claims.

### III. Conclusion

For the above stated reasons, the District's motion for summary judgment will be granted.  Judgment will be entered in favor of the District and against Plaintiffs on all claims.

An appropriate order follows.

| | |
|---|---|
| November 6, 2014 | /s/ A. Richard Caputo |
| Date | A. Richard Caputo |
| | United States District Judge |

---

[3]   Although Mrs. Bridges informed Mr. Paris of the bullying, it is unclear from the record whether she indicated that Mrs. Wilcha's conduct was racially motivated.